UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, for the use and benefit of BARCELONA EQUIPMENT, INC. | CIVIL ACTION |
| VERSUS | NO. 11-2183<br>C/W 11-2295<br>C/W 11-2983<br>C/W 12-0496<br>C/W 12-0787<br>C/W12-0838 |
| DAVID BOLAND, INC., INC., ET AL. | SECTION "K"(4) |

Re: Target Construction, Inc. v. Kendra &
    Associates, et al., C. A. No. 12-838

## ORDER AND REASONS

Before the Court is a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) (Doc. 51) filed by defendants Technical Works, Inc. ("TWI"), Ingrid Arciniaga ("Ms. Arciniaga"), and Robert Arciniaga ("Mr. Arciniaga") who contest this Court's *in personam* jurisdiction over them and who move for dismissal based on this alleged deficiency. The Court has reviewed the pleadings, memoranda, exhibits, pleadings and the relevant law, the Court finds no merit in the motion. In essence, the moving defendants allegedly actively participated in the formation and performance of two large-scale construction projects located in the Eastern District of Louisiana and in doing saw participated in an allegedly fraudulent conspiracy which had serious, deleterious effects in Louisiana. As such, this motion must be denied.

## II. BACKGROUND

Target Construction, Inc. ("Target") is a Nevada corporation authorized to do business in Louisiana. (Complaint, ¶ 1). The United States Army Corps of Engineers ("the Corps")

contracted with David Boland, Inc. ("Boland") as prime contractor to perform the complete construction of a Corps project (USACE Project Number W912P8-10-C-0079) near the Lakefront Airport in New Orleans, Louisiana ("the Lakefront Airport Project") on May 26, 2010[1]. (Complaint, ¶21). The Corps also contracted with Lakeshore Engineering Service, Inc. ("Lakeshore") as prime contractor, to perform the complete construction of another Corps project (USACE Project Number W912P8-10-C-0050) near the Cross Bayou drainage structure in Destrehan, Louisiana ("the Cross Bayou Project"). (Complaint ¶ 23). (See also Memorandum of Target, Affidavit of Jeff Fegert, President of Target, Doc. 67-1, ¶¶ 5, 7) (hereinafter "Fegert Affidavit"). Both Lakeshore and Boland entered into subcontract agreements with Target, as subcontractor, "to provide certain work." (Complaint, ¶¶22, 24; Fegert Affidavit, ¶¶6, 8).

Target sought to sub-subcontract out the fabrication and installation of certain structural steel installations. (Fegert Affidavit, ¶ 9). That sub-subcontracting responsibility fell to Target's then Gulf Coast Regional Manager, Edward Riggs. (Fegert Affidavit, ¶ 10). Eventually, those sub-subcontracts were awarded to the Kendra[2] defendants herein, and those contracts are the focus of the complaint herein. Target alleges that the Kendra bids were artificially inflated by virtue of information gained by Ingrid Arciniaga (Ms. Arciniaga), with whom Mr. Riggs had a romantic relationship and who had a monetary interest in Kendra's accounts receivables. Therein lies the gravamen of Target's Complaint.

As background, Ms. Arciniaga is the President of TWI, a California corporation which is

---

[1] [1]*United States of America for the Use and Benefit of Target Const., Inc. v. David Boland, Inc., et al.,* C.A. No. 11-2038 SSV-JCW, Complaint, ¶ 7.

[2] [2]These companies are Kendra Construction Services, Inc. ("KCS"), Kendra & Associates, Inc. ("K&A") and JRS Industries, Inc. ("JRS") (collectively "Kendra"). (Complaint ¶13).

a staffing company that provides skilled and technical labor to various businesses located primarily in California. TWI has two offices, one in the City of Industry, Los Angeles, County, California and another in Bakersfield, California. (Document 51, Motion to Dismiss, Affidavit of Ingrid Arciniaga, Exhibit "A", ¶ 2). Mr. Arciniaga is a director of TWI; he avers that he is not involved in the day to day operations of TWI. (Document 51, Motion to Dismiss, Affidavit of David Arciniaga, Exhibit "B", ¶ 1. Nonetheless, Target alleges that Ingrid and Robert Arciniaga were and are the alter ego of TWI and are thus personally liable for the damages alleged herein. (Complaint, ¶¶13-15).

Prior to Target's search for a structural steel sub-subcontractor, TWI had developed a controlling financial and managerial interest in a series of successor structural steel fabrication companies. (Fegert Affidavit ¶13). These companies, also named defendants in this matter, are as previously noted Kendra Construction Services, Inc. ("KCS"), Kendra & Associates, Inc. ("K&A") and JRS Industries, Inc. ("JRS") (collectively "Kendra"). (Complaint ¶13). According to Ms. Arciniaga, TWI began providing labor and payroll services under a written contract with K&A in November of 2009. (Motion to Dismiss, Affidavit of Ingrid Arciniaga, Doc. 51-2 Ex. "A", ¶ 2) (hereinafter Ingrid Arciniaga Affidavit). As of July 2010, Kendra was delinquent in the payment of invoices from TWI in the amount of at least $487,735.15. Nonetheless, TWI entered into a second service agreement with Kendra (as K&A). (Fegert Affidavit, ¶16).

As a result, on July 23, 2010, K & A entered into a "Reaffirmation, Pledge and Security Agreement" ("RPSA"), and Kendra Construction, Inc. entered into an identical RPSA with TWI on August 12, 2010. Through these two instruments, the outstanding debt was reaffirmed. In addition, Kendra granted to TWS a lien on and security interest in, all of Kendra's right, title and interest in its receivables, contract rights and proceeds. Ingrid Arciniaga Affidavit, ¶ 6 and Exhs.

2 and 3attached thereto.

Target alleges that it entered into an agreement and/or agreements with Kendra as sub-subcontractor to perform work involving the fabrication and installation of structural steel installations for the Lakefront Airport Project ("the Lakefront sub-subcontract") and the Cross Bayou Project ("the Cross Bayou sub-subcontract"). (Complaint ¶25). As a specific condition of Target's hiring Kendra for work on the two projects, Target requested that TWI agree to supply labor for Kendra's scope of work and to manage Kendra's finances relative to Kendra's participation on the Projects. Both Kendra and TWI allegedly agreed to this arrangement and TWI did supply labor for these two projects. (Complaint, ¶¶ 26-27).

Target contends that as part of the contracting process for the Lakefront Airport Project and the Cross Bayou Project, Target submitted bids for its scope of work to Boland and Lakeshore, respectively as prime contractor on each project. Included in each bid was a budget for specific categories of the work to be performed by Target, which budget was approved by Boland and Lakeshore, respectively. (Complaint, ¶ 28). In bidding for the two sub-subcontracts, Kendra submitted bids representing Kendra's actual appraised value of the costs of performing each sub-subcontract, together with standard markups for overhead and profit. (Complaint, ¶ 29). Target awarded the sub-subcontracts to Kendra for the two projects. (Complaint, ¶ 30).

Target further alleges that because of the relationship that Ms. Arciniaga had with Edward Riggs, "the Arciniagas were able to obtain sensitive and proprietary business information as to Target's operation, including the amounts budgeted by Target for the scope of work of the projects assigned to Kendra which were the subject of the sub-subcontracts." (Complaint, ¶31).
In particular, after the Kendra sub-subcontract bids were accepted by Target, the defendants

learned through Mr. Riggs "that the amount budgeted by Target for the scope of work assigned to [Kendra] for each Project was higher than the amount of" Kendra's bid on each Project." (Complaint, ¶32). "As such, in concert with the Arciniagas/TWI, Kendra thereafter artificially inflated the amount of its bids on the Lakefront sub-subcontract and the Cross Bayou sub-subcontract, respectively, for the specific purpose of inducing Target to issue purchase orders to Kendra/TWI at an increased cost to Target which cost increase was not reflective of any corresponding cost increase to Kendra/TWI." (Fegert Affidavit, ¶29).

Target thereafter did in fact issue artificially inflated purchase orders to Kendra in reliance upon the material misrepresentations of the defendants, to Target's actual detriment. (Complaint, ¶34). Furthermore, Target maintains that TWI assisted in the management of Kendra's finances relative to Kendra's participation on the Projects including TWI's participation in numerous meetings and conferences among the defendants and Target at which time the defendants "assured Target that Kendra would complete its agreed-upon scope of work within the agreed budgetary constraints." (Complaint, ¶ 35).

Target alleges that Kendra repeatedly submitted budgets on the Lakefront Airport Project which purported to increase the amounts necessary to complete Kendra's scope of work. Eventually it was revealed that each budget included substantial over billing by the defendants. (Complaint, ¶36). Target also alleges that instead of applying payments made by Target toward Kendra's scope of work on the Lakefront Airport Project, the defendants were diverting funds to pay outstanding debts owed by the defendants to third parties. (Complaint, ¶37).

Due to the allegedly defective work by Kendra, Target was forced to expend additional funds and labor costs in replacing a platform which Kendra fabricated improperly. Target's costs in this regard included the costs of shipping the non-functional platform to the job site from

California. (Complaint, ¶38).  The defendants also failed to pay Target the purchase price of a lift mechanism it purchased at the direction of Kendra for use on the Lakefront Airport Project.

Target makes similar allegations of misdeeds concerning the submission of budgets on the Cross Bayou Project which purported to increase the amounts necessary to complete Kendra's scope of the work. (Complaint, ¶ 40).  As a result, Target's contract with Lakeshore was terminated on March 14, 2011, terminating Kendra's participation on that project. Nonetheless, Target contends that the defendants "were able to extract an additional payment from Lakeshore of funds actually owed to Target, which payment amount was far in excess of the amount owed to Kendra for its work on the cross Bayou Project." (Complaint, ¶¶ 41-42).

Based on the foregoing, the instant lawsuit was filed on March 29, 2012, asserting causes of action for fraud and violation of the Louisiana Unfair Trade Practices law, La. Rev. Stat. 51:1401 against TWI, Ingrid Arciniaga and Robert Arciniaga ("the TWI defendants").

This motion to dismiss was subsequently filed by the TWI defendants who contend that TWI never entered into any contractual relationship with Target at any time and that it has never conducted business in or provided labor or services of any kind in the State of Louisiana.  Ingrid Arciniaga contends that she has only been to Louisiana once in her life on vacation to celebrate Mardi Gras and has never conducted business with anyone in Louisiana at any time on behalf of TWI.  Mr. Arciniaga avers that he has never personally conducted business with anyone in Louisiana at any time on behalf of TWI.  The TWI defendants acknowledged that it entered into the aforementioned RPSAs for amounts Kendra owed TWA and that Target was a company with an account receivable owing to K&A under the respective RPSA.   However, it maintains that all discussions the TWI had with Target employees concerning Kendra took place in California or Nevada.  Indeed, the TWI defendants maintain that Kendra is still indebted to TWI for staffing

services.

With respect to TWI's involvement with Kendra, Ms. Arciniaga avers:

> Target was named as a company with an accounts receivable owing to Kendra under the RSPAs. I was informed that Kendra had a large purchase order to fabricate certain structural steel components for Target at its Bakersfield, California facility. I learned at that time that Target is a contractor with its principal place of business in law Vegas, Nevada. Thereafter, I contacted Target in Las Vegas to confirm the pending purchase order.

(Affidavit of Ingrid Arciniaga,¶ 7).

With respect to the allegations concerning the Lakeshore Engineering Services, Inc., which is located in Detroit, Michigan, TWI contends that it "learned that Kendra would be invoicing LES in Michigan directly for the components it was fabricating in California." (Affidavit of Ingrid Arciniaga, ¶ 9). As a result, on April 7, 2011, TWI's attorney in California notified LES of the assignment of the Kendra accounts receivables and that all payments due to Kendra should be made directly to TWI. Nonetheless, the TWI defendants maintain that LES issued a check directly to Kendra on September 8, 2011 in the amount of $149,289.52 to which it maintains it was entitled under the RPSA. On January 30, 2012, eight months after this suit had been filed, TWI filed a lawsuit in Los Angeles against Kendra for breach of the RPSA and against "various account receivable debtors of the Kendra entities, including LES for failing to pay TWI after receiving notice of the assignment of Kendra's accounts receivables." (Affidavit of Ms. Arciniaga, ¶¶ 10-12). With these allegations in mind, the Court will now turn to the legal analysis required.

**II. LEGAL STANDARD**

"'[T]he party who seeks to invoke the jurisdiction of the district court bears the burden of establishing contacts by the nonresident defendant sufficient to invoke the jurisdiction of the

court."' *Felch v. Transportes Lar-Mex SA DE CV*, 92 F.3d 302 (5th Cir. 1996) citing *Bullion v. Gillespie*, 895 F.2d 213 at 216-17. When making such a determination without conducting an evidentiary hearing, the allegations of the complaint, except as controverted by opposing affidavits, must be taken as true, and all conflicts in the facts must be resolved in favor of the plaintiffs. *DNH, L.L.C. v. In-N-Out Burgers*, 381 F. Supp. 2d 559 (E.D.La. 2005) citing *Thompson v. Chrysler Motors Corp.*, 775 F.2d 1162, 1165 (5th Cir. 1985). In making that determination, affidavits, interrogatories, depositions, oral testimony or any combination of recognized [discovery] methods may be considered by the court. *Id.*

The Court would note that no response was filed to plaintiff's opposition and in addition a number of rather damaging e-mails that were attached to the affidavit of Jeff Fegert, President of Target, which are business records and thus admissible evidence. These e-mails seem to support the allegations of Ingrid Arciniaga's active participation in the matter as alleged. For instance, she wrote to Mr. Fegert on March 15, 2011 "TWI would not allow Kendra to enter into ANY contract with ANY company without TWI's total consent. TWI has also acted as a fund's control company, as we have signed an agreement with every vendor and supplier. Had TWI not been involved in the day to day spending habits of Kendra, they would have far exceeded the budget several months ago." (Affidavit of Fegert, Exh. I).

**Personal Jurisdiction**

"A court has personal jurisdiction over a nonresident defendant if (1) the forum state's long-arm statue confers personal jurisdiction over that defendant and (2) the forum state's exercise of jurisdiction complies with the Due Process Clause of the Fourteenth Amendment. *Level 10 Promotions , LLC v. Wilkes-Barre Motors, Inc.*, 2008 WL 2781534, *2 (E.D. La. July

14, 2008) (Vance, J.) citing *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999). Because Louisiana's long-arm statue extends jurisdiction to the maximum limits permitted by due process under the Constitution of the United States, La. Rev. Stat. § 13:3201(B), the Court must determine whether the exercise of its jurisdiction in this case satisfies federal due process requirements.

> As stated by the Fifth Circuit Court of Appeals:
>
> The Due Process Clause of the Fourteenth Amendment permits the exercise of personal jurisdiction over a nonresident defendant when (1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing "minimum contacts" with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend "traditional notions of fair play and substantial justice." To comport with due process, the defendant's conduct in connection with the forum state must be such that he "should reasonably anticipate being haled into court" in the forum state.

*Latshaw*, 167 F.3d at 211.

Minimum contacts with the forum state can arise incident to either "specific jurisdiction" or "general jurisdiction." *Marathon Oil Co. v. A.G. Ruhrgas*, 182 F.3d 291, 295 (5th Cir. 1999). The *Marathon* court explained:

> The "minimum contact" prong of the inquiry may be further subdivided into contacts that give rise to "specific" personal jurisdiction and those that give rise to "general" personal jurisdiction. Exercise of specific jurisdiction is only appropriate when the nonresident's contacts with the forum state arise from or are directly related to the cause of action. General personal jurisdiction is found when the nonresident defendant's contacts with the forum state, even if unrelated to the cause of action, are continuous, systematic, and substantial.

*Id.* Furthermore, with respect to general personal jurisdiction, the minimum contacts review is more demanding and broader and requires a plaintiff to demonstrate substantial activities in the forum state.

The Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984), clearly held that if intentional conduct is intended to cause injury in a specific state, that is sufficient to give specific

jurisdiction to the courts of that state. *Kwik-Kopy Corp. v. Byers*, 37 Fed. Appx. 90, 2002 WL 1021889 (5th Cir. May 9, 2002). In the case at bar, it is clear that Target has alleged that the defendants undertook a course of action that clearly would have a deleterious effect in Louisiana. The cost of the projects undertaken by the Corps would be fraudulently increased and indeed, were delayed. In fact, this case is but one of six that have been consolidated in this Court arising out of Target's contract with a number of sub-sub contractors who have allegedly not been paid as well as Target having sued Boland for its alleged breach of contract. It is because of the inter-relationship of all of these contracts and dealings that these cases have been consolidated for pre-trial purposes before this Court.

The Court recognizes that the Fifth Circuit has required more than "one act" with the forum state to support specific jurisdiction. In *Kwik-Kopy*, the court noted the Fifth Circuit's holding in *Panda Brandywine Co. v. Potomac Electric Power Co.*, 253 F.3d 865 (5th Cir. 2001), where the appellate court found it inappropriate to confer specific jurisdiction over a nonresident defendant in Texas based merely on plaintiff's conclusory allegations of tortious interference of contract and the fact that the nonresident should have *foreseen* that its actions would cause injury in Texas simply because the plaintiffs resided in Texas. *Kwik-Copy* at *5. In this instance, it was clear that the inflation of costs would effect two contracts in Louisiana and would harm the people of Louisiana by virtue of the delays and cost overruns of Corps projects in the state. The allegations of wrong-doing are not conclusory; they are specific and supported by e-mail correspondence. While the construction of and providing of labor for that construction did not occur in Louisiana, the effects thereof clearly would be felt in this state.

As to the second prong, that is to determine the fundamental fairness issue, the Court examines:

> the burden on the defendant, the interest of the forum state, and the plaintiff's interest in obtaining relief. [the court] must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.

*Asahi Metal Indus. v. Superior Court of California,* 480 U.S. 102, 115 (1987). While the first consideration, that is the burden on the defendant, weighs against the Court's exercise of jurisdiction being fundamentally fair, the rest of these criteria support the Court's exercise of jurisdiction. Clearly, as both of the Corps projects were performed in Louisiana and for its benefit and protection, the cost overruns and failure to timely and efficiently complete these projects effects Louisiana, the interest of the forum state is paramount. As to the interest of the plaintiff in obtaining convenient and effective relief, as previously noted much of the litigation that arises out of these two Corps projects has been lodged in the Eastern District of Louisiana for adjudication. Clearly, it is in the plaintiff's interest to have a center for all of the litigation arising out of these contracts and Target has chosen to pursue them in this forum. Likewise, it is the most efficient resolution of the controversies in the context of the interstate judicial system's interest since discovery in this matter will be coordinated and streamlined by virtue of the consolidation. The Court has made clear that the parties are to attempt to coordinate the depositions of the parties involved so that there will be no overlap and that each witness will be deposed only once. This approach should minimize the cost of the litigation. Finally, the shared interests of the states in furthering fundamental social policies, such as preventing fraudulent and inflated billing occurring in Corps projects, would be served by this matter being heard in this Court. As such, the Court finds that the moving defendants in this case could have reasonably

expected to be called into a Louisiana court, and they have sufficient minimum contacts with the State of Louisiana appropriate to confer jurisdiction on this Court. *Ryerson v. Deschamps*, 2006 WL 126634 (S.D.Tex. Jan. 13, 2006). Accordingly,

**IT IS ORDERED** that the Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) (Doc. 51) filed by defendants Technical Works, Inc., Ingrid Arciniaga and Robert Arciniaga is **DENIED.**

New Orleans, Louisiana, the 27th day of August, 2012.

```
                              STANWOOD R. DUVAL, JR.
                         UNITED STATES DISTRICT COURT JUDGE
```